Our third case for this morning is Remijas v. Neiman Marcus Group. Good morning. Mr. Maia. Yes, may it please the Court, I am Theodore Maia. I'm here representing the named plaintiffs and appellants in this action, as well as the putative class that they seek to represent, which, it bears repeating, consists of consumers whose personal and or financial information was disclosed in the data breach that affected Neiman Marcus in 2013. And, as you know from reading the briefs, despite that Neiman Marcus received information about the breach at least as early as mid-December 2013, I have failed to make any disclosures about that breach whatsoever until January 2014, when the holiday shopping season had passed conveniently. Now, although this appeal raises several issues that are outlined in our opening brief, there is a critical central issue that must be addressed, and that potentially could resolve the entire appeal. That is, does disclosure of consumers' payment card data to hackers and thieves through a data breach that's allowed to occur by virtue of a retailer's negligent and deficient cybersecurity measures constitute an injury in fact, giving such consumers standing to sue in federal court? The district court said no, holding that such consumers must plead unreimbursed fraudulent charges in order to have standing. Defendant Apelli takes this reasoning to its natural conclusion, arguing that because consumers disclose payment card data to waiters and websites the world over, this data has no or de minimis intrinsic value and really isn't private at all. So let me ask a question. It's true that your opponents argue that everybody who suffered fraudulent charges had those payments reimbursed. Do you concede that, or is there evidence in the, I mean, this is a very preliminary point. However, I can say that there are no allegations in the complaint that any of the plaintiffs, the named plaintiffs, have unreimbursed fraudulent charges. So, but are the allegations one way or the other? Here's what I'm going to be discussing this with the other side as well. They make the assumption that all credit card issuers reimburse at the 100% level. But, of course, that's not the law in the United States. The law is that a consumer is liable for up to $50 for losses that are incurred before the reporting that the card is lost. That's 15 U.S.C. Section 1643. And what I need to hear from you is whether, in addition to these direct losses, potentially unreimbursed, depending on the card issuer, what's your theory about the, let's say, the time lost in trying to track down, you know, notifying the credit card company that there have been unauthorized charges, et cetera, et cetera? Our theory is that those are injuries, in fact, that create standing for such consumers. And furthermore, that those members of the putative class that did not suffer fraudulent charges do have standing by virtue of the threatened harm, similar harm that we can see already has occurred to a certain percentage of that putative class in the form of fraud. Now, does your complaint allege, I think somewhere in the record I recall, that when Neiman Marcus notified the 350,000 people of the data breach, they offered a year's free credit monitoring? Is that true? Where did that come in? Yeah, except that there was never any actual notification of 350,000 people. There were notices sent to, according to Neiman Marcus's terms, those consumers whose contact information they had. All right, so some subset of the 350. Right. And then there was a public disclosure on their website. Okay. But they offered free credit monitoring? Yes, Your Honor. And do we know anywhere what credit monitoring costs on a monthly or yearly basis? That is not in the complaint. But apparently the offer, Neiman Marcus must think it costs something if they're offering it. You can Google this, and I know that there's monthly charges for such credit monitoring normally in the $20 range. $20 a month or so, yeah. And there were specific allegations with regard to two plaintiffs suffering charges on their accounts, right? That's correct, Your Honor. And a third who received a notice stating that her account had been compromised. It's unclear if there were fraudulent charges executed on that account. I would like to address this issue of the card issuer's zero liability policies. This is the basis on which the district court rested its ruling that you need to plead unreimbursed fraudulent charges. And this is the defendant, Pelley, invokes these policies to essentially exculpate him of any liability here. Those policies are not properly before the court. The only evidence to the extent it can be considered evidence about these policies is defendant's statement in its disclosure on its website and the ones that it mailed to certain consumers stating that it's the policies of payment card brands such as Visa and MasterCard to provide that you have zero liability for fraudulent charges. So Neiman Marcus said that without checking with the issuers? That is Neiman Marcus's statement. Okay. And the compromised cards are what? A combination of – I mean, Neiman Marcus probably has its own credit card. I don't know. I don't have one if they do. But Neiman Marcus – and then just, you know, American Express or Visa, MasterCard, Discover, whatever? That's correct, Your Honor. I don't think any of the named plaintiffs have Neiman Marcus cards at issue. And I think – don't hold me to this. I think there's a statement in Neiman Marcus's disclosures that the Neiman Marcus card wasn't affected. I'm not sure about that. Was or was not? Was not. Was not. But our clients have credit and debit cards issued by banks like Chase. Right. And, you know, furthermore, on this issue of zero liability policies, the proposition that these policies work to effectively eliminate consumers' costs associated with fraudulent charges and most or all of the time simply is not a proper subject of judicial notice. Furthermore, it's not true. Many of us have anecdotal stories about this. So are there any allegations in the complaint? One of the things that occurs to me looking at this is you certainly have alleged that the 9,200 people have had fraudulent charges, right, which is actually a fairly large number of people. It made me start wondering about subclasses. Have you alleged that anyone in this class already has had his or her identity stolen, or is the allegation just prophylactic measures against a risk? Well, Your Honor, there is a distinction being drawn in some of these papers between identity theft and fraudulent charges. Exactly. That's what I'm trying to get at. I don't accept that. You know, fraudulent charges are a form of identity theft. Somebody is taking your account, making a charge with it, purporting to be you, and absconding with the money in one way or another. It's illegal, and it is a form of identity theft. Actually, I believe under federal criminal statutes, you're right, it would be. There are other forms of identity theft. One can assume your identity and open up accounts. We haven't alleged that here, but it is possible, and depending on the personally identifying information that may have been disclosed here, there is an elevated risk of that form of identity theft as well. But I don't see that distinction as being valid in fraudulent charges and identity theft. So have you alleged anything more than just an association of a name and a credit card number were stolen, were revealed? It is very unclear what information has been disclosed. That is a portion, actually, of the plaintiff's claims under the State Data Breach Acts and the California Customer Records Act in particular, which requires that consumers be notified as to precisely what was disclosed and whether they were affected. Defendant's statements are things like social security numbers were not disclosed, PIN numbers were not disclosed. But some of the things compromised were debit cards, were they not? Yes. Debit and credit. I mean, the regime is different for debit cards in terms of covering losses. Now, I believe Neiman Marcus doesn't accept use of debit cards where you have to enter a PIN, but if they have a Visa logo, they can be used like a credit card at a store. Right. So maybe you should talk about Clapper a little bit. Your opponents rely very heavily on Clapper to say that you have no standing because whatever harm occurred to the class isn't sufficiently imminent. Right. Well, Clapper states the requirements for Article III standing as requiring an injury that is concrete, particularized, and actual or imminent, barely traceable to the challenged action, and redressable by favorable ruling. Now, that's a quote from Clapper, and it's saying actual. Which in turn is a quote from Lujan, right? Right. Actual or imminent. Here we have some people with actual injuries already in the form of these fraudulent charges. The time spent redressing those, there is actual harm already. So you don't really need to go through the analysis of whether an increased risk of future harm can provide standing. Now, that analysis might. So this is your 9200, though. Is it possible that you just reached too far in terms of the size of the class, and what we should do is invite the district court to reconsider that? Your Honor, the inquiry as to standing to bring suit under Article III is distinct from the inquiry about standing as to pursue a class action on behalf of a given class. The Rule 23 inquiry. Right. The Rule 23 issue should be addressed at the class certification stage, not at the motion to dismiss stage. This court has ruled this way in Payton v. County of Kane in 2002. And as you know, when moving for class certification, the discovery will have been conducted and the class definitions can be modified. There are, I can speculate, a potential variety of subclasses that could be framed, including California consumers who have claims under the Customer Records Act and or California's unfair competition law, as well as a nationwide class. There could be subclasses of people with fraudulent charges or those. But I would argue that those whose information has been disclosed as pled in the complaint, even if they haven't suffered fraudulent charges, they clearly have a substantial, if not certainly impending, increased risk of fraudulent charges and identity theft. Okay. Well, if you'd like to save a little rebuttal time. I would, Your Honor. That would be fine. Thank you. Certainly. Mr. Hoffman. Good morning. May it please the Court. This is a purported consumer class action. In such cases, they're often filed almost immediately after a company announces a cyber attack. And they are often dismissed at the Rule 12 stage because just because a consumer shops at a store when a cyber attack occurs does not automatically mean that the consumer suffered a legally cognizable injury. And that is often the basis for the dismissal at Rule 12 often understanding. That's what occurred here in the District Court. Recognizing the fundamental importance of the standing gatekeeping functioning and determining whether the plaintiffs had met their burden of coming forward with specific allegations and facts to demonstrate that they've met the well-established test. Applying that test, he found, going carefully through their various claimed injuries, that none of them met the test. It's kind of a cursory investigation, actually, I thought, by the District Court. But here's what worries me. I mean, there's no doubt that the people that Neiman Marcus notified had been subject to this data breach had already suffered the data breach. So their information from Neiman Marcus's own records had been compromised. And people whose information is compromised, as Neiman Marcus itself recognized, are at a much greater risk of identity theft. That presumably is why they offered a year's free credit monitoring. And even if, which I believe is not, I don't think this fact is before us, even if some people had their fraudulent charges reimbursed, identity theft victims, at least according to the Bureau of Justice Statistics, spend a lot of money to put monitoring provisions into place. That money probably is well spent. According to BJS, about 14% of identity theft victims experience out-of-pocket losses of $1 or more. The average cost is $17,769. You know, it's a real immediate injury, it seems to me. I think it is true that if this was a case where there was an indication of identity theft having occurred. No, no, no. Let's just back up and say this is a case where the person knows, thanks to Neiman Marcus' notification, that his or her credit card information has been compromised. And so the person is already right now in a position needing to take some preventive medicine measures to ensure that no greater loss occurs. And so why isn't that an imminent loss? Well, I'd say two things, Your Honor. First of all, the line between a credit card information being compromised and not other sensitive identifying information, not Social Security numbers or driver's license numbers or things that really logically would allow someone to steal someone's identity. If it's just payment card data, the courts have made it clear that the line between that payment card data and identity theft is quite a speculative line. Well, but wait a minute. I mean, your opponent argues that this might mean at the class certification stage, not at the standing stage, there might be narrowing of the proposed class. I mean, you have a lot of people who actually have had fraudulent charges, and, in fact, the federal identity theft statute would include the use of somebody's payment card. So what I'm looking at is the immediate need to spend money to ensure that the compromise of the information doesn't yield a worse damage. I mean, there's just a huge amount of money spent in the economy each year on precisely that. Experian offers these things for $20 a month, you know. Your Honor, I think the district court did get it right that a risk of identity theft here is neither. It's certainly impending, nor, even if the substantial risk test is used, that there's a substantial risk. Really? And I think one of the things to look at carefully here is… Why didn't Neiman Marcus offer the monitoring then? Well, Neiman Marcus, in an abundance of caution, not only offered monitoring, but my opponent is wrong. They gave notice to everyone who had shopped at Neiman Marcus in the store or online for a year, even though all the evidence showed that the cyberattack was occurring for about a two- or three-month period in the store. So it is de rigueur and proper to provide this good customer care by saying, we'll provide you with free credit monitoring and identity theft insurance of up to $1 million. If you look at the allegations of this complaint, it is the plaintiff's burden to come forward with specific allegations that show they suffered an injury or something is imminent. Weren't there 60,000 suspicious behavior alerts that Neiman Marcus received? Well, the 60,000 alerts were alerts, and this is in the record, were alerts that a piece of software was being executed in the temporary directory. That's what it said. And it is normal for some companies in the IT world to have a software that is executed in the temporary directory. So it wasn't an alert. It was a notice that this was occurring, and it was normal in the Neiman Marcus system. So while there has been one press report, which the plaintiff sees on, that calls that an alert. But Neiman Marcus had turned off their security mechanism. No, I don't think that's right at all, no. At least that's what was alleged. Well, but the allegation is based on the article. But the whole point here is that listen to us talking about these presumed facts. This is such an early stage. You win, I think, only if we think that people should ignore these compromises of their payment card information, and potentially more, we don't know, and that companies like Neiman Marcus are behaving in an economically irrational way to offer a million dollars' worth of credit insurance. It seems to me that's evidence itself in the record, that there's something right now that's a problem, which would take you out of Clapper. Clapper, of course, is a case that has five layers of hypotheticals before you get to your phone call to your friend in England being overheard by the NSA. Here we have a theft that's already occurred, or a compromise that's already occurred, and a concrete amount of money necessary to fix the exposure. I'm not sure I agree with the concrete amount of money. And I think one thing that I would ask the court to do is look very carefully at how thin the allegations are in this complaint. It is not our position that there is no data breach case, whether it involved payment card data or more sensitive data, that would not lead to moving beyond Rule 12. But if you look at this complaint, there are no specific allegations of what cost the plaintiffs have suffered, of why they would believe that payment card data being potentially compromised, and the district court drew very liberal inferences in their favor in finding that it was either actual or imminent regarding the charges, but then determined that that was not concrete. And to say that every cyber attack where payment cards are potentially compromised would lead to consumers being able to come into court and allege, with the specter of identity theft, that therefore they have an imminent risk is really contrary to what we believe is a proper understanding of both Clapper and this longstanding test about how to understand imminence. But, you know, what I'm still trying to think about is whether what you're describing is a situation that should be addressed either alternatively at the class certification stage or the merits stage, or whether what you're really describing is something properly understood as standing. And the very first thought is just this isn't Clapper, whether it's some other case where there is standing, that's on the table for sure. But Clapper is way out there at the speculative end of the spectrum, which is why the Supreme Court undoubtedly ruled as it did in Clapper. And one of the things that bothered me about your brief is the notion that, you know, suppose somebody makes a charge for $750. They discover an unauthorized $750 charge on their account. They complain to Visa. Visa credits them back with $750. You think that that's an instantaneous transaction, but I can tell you, according to my personal experience, but never mind that, you know, statistics, it isn't. You know, it can take hours of time. It can take weeks to call and be put on hold and wind your way through computer menus. And, you know, I would think that you and your partners at your law firm value your time. Rumor has it, you know, at a high level. So I can't believe that the time it takes to sort these things out equals zero. Well, the clear fact that both the ñ and it's in the record that the credit cards provide for zero liability and that it was ñ and under APEX ñ let me address a couple things in that question. First of all, at the Rule 12 stage, under this court's APEX digital decision, it is absolutely proper for the defendant to come in and make a factual challenge to standing, and that allows for other evidence to be brought in, extrinsic evidence to be brought in for the district court to examine it because standing needs to be determined at each stage of the proceeding. So examining evidence that Neiman Marcus brought in outside of the four corners of the complaint is proper. But was it really competent evidence? You're just saying we are ñ take our word for it, all these other people reimburse at 100 percent, when, in fact, you will take debit cards if there's no PIN. Debit cards fall under the ñ I think they fall under the Electronic Funds Transfer Act, and you could actually be liable for everything in your account. It's not ñ they don't work like credit cards. Credit cards could still leave you $50 in the hole, depending on who the issuer is and what its policies are. It seems to me they're just fact issue upon fact issue here that were not properly teed up either by your presentation or anywhere else. Well, with respect to the plaintiffs here, this complaint doesn't allege any of those things. It doesn't argue any of those things. It doesn't argue that there was a potential for ñ But you're asking for fact pleading of a really extraordinary level beyond Twombly and Ashcroft, I think. I don't think that's right with regard to standing. With regard to standing, it is the plaintiff's burden at this stage to allow the court to feel satisfied that there is a case or controversy. But that's the problem. It's a judgment call, and what Judge Wood's been outlining is that it seems to fall on the side of your opponents rather than your side. In other words, you've got the fact that names, addresses, phone numbers, driver's licenses, and all that information was disclosed by this malware. Well, first of all ñ That's the allegation. That is ñ Well, they mentioned Social Security numbers and driver's license numbers without any reason to say that, and we put in ñ And Apex Digital allows this. We put in competent evidence, including sworn testimony from Neiman Marcus's chief information officer before the Senate Judiciary Committee that explained the scope of this attack. And it was much narrower. It did not involve Social Security numbers or driver's license numbers. And Neiman Marcus did disclose way beyond the people who potentially were compromised. This 9200, as the district court found, is not people who we know had their information stolen from Neiman Marcus, but some people who later had charges on their card. But the hackers had access to 350,000? The hackers had access within Neiman Marcus's system, meaning the malware within Neiman Marcus's system was in place when 350,000 payment cards were swiped at Neiman Marcus.  And what happened with that is completely unknown. So the need under Article III for there to be an allegation of a concrete and imminent injury is simply not met here when the ñ I'm sympathetic perhaps maybe more than Judge Wood is with regard to whether you could prove ñ whether they'd be able to prove much damages when they come to that stage. But it seems to me at this stage on the standing issue, it's a less ñ there's less demand. Well, certainly there's a difference between damages at the merit stage. But it is their burden to establish through either allegations or when we put facts in the record, facts that contradict ours, that there is an injury. And if the injury has not occurred yet, they need to show that it is imminent. And imminent has been interpreted. How do you answer the fact that Neiman Marcus volunteered then to provide worth something, this security thing, for a year? Well, I don't think it would be helpful or ñ in terms of providing incentives to companies, certainly companies should not be penalized for providing this and have it help them. Well, they should be penalized, but it's acknowledging the fact that there is something out there. Well, they did acknowledge that, look, we had this malware that was in our system. This number of our customers had their credit cards used and were visible to the malware. And to make everything as convenient as possible for our customers, we are offering this service. That should ñ to hold that against them as an indication that there actually was an injury would mean that companies would think twice. You would think about this because it provides a disincentive to do that. And I don't think it's right to draw a line between the providing of identity theft insurance and credit monitoring to say that means there automatically was an injury. I think it actually ñ Doesn't it fall in the broader line of cases, though, where ñ I'm thinking of the medical monitoring cases and so forth. There's a whole line of cases where you have suffered the injury up front by the exposure, so to speak, whether it's exposure to asbestos or whether it's exposure to malware or whether it's exposure to something else. And that's understood to be, insofar as it exists, imminent. You're done right now. It's not tomorrow's problem. I think it was the Riley Court in the Third Circuit that addressed this that said, once that exposure has happened, there is an immediate physical injury to your body. It changes your cells. You can see the injury. The Monsanto case is an example of a case that's clearly distinguishable. Farmers ñ I'm sorry. I see my time is up. You can finish your thought. Farmers are attempting to grow organic alfalfa crops. Right. This is the can we certify that we're organic? And even if it's never contaminated, the risk of the contamination immediately injures their crops, lowers the value because of the perception, so they have to spend money. That is very different than the situation here. Okay. Thank you. Do you want to wrap up? Okay, fine. Thank you very much. Anything further, Mr. Maia? As far as the detail of our allegations, I mean, I think they're pretty detailed. This is not a Rule 9 case. This is a case under Rule 8. And if you look at the allegations around paragraphs 45 to 56 in the first admitted complaint, we allege time that these plaintiffs were deprived of the use of their ñ or access to their cards. We describe in some detail the steps that, for instance, Plaintiff Frank had to go through. We did not necessarily quantify the amount of time spent, but there certainly was time spent. We, I suppose, could amend to include such detail, but the district court terminated our case. So what about Mr. Hoffman's point that once standing is put at issue, it was up to you to come forth with factual details to support your position? Well, the district court didn't rely on any of the facts in this declaration that they submitted. He actually says he's not relying on them, doesn't he, I think? I believe that's right. Yeah. And the evidence that was submitted are largely self-serving statements, I would say, by the defendant. What we do allege is that these plaintiffs received ñ several of them received the individual notices in the mail from defendant concerning the breach, indicating that they were part of this breach. They made purchases even within the limited time frame that defendant admits the malware was collecting data from its system. And as a side note, we do not accept the defendant's position there, because it seems very strange that the malware just stopped collecting data in October, in between October and January when they say they finally disabled it. But even accepting that limited time frame, we have plaintiffs. We allege that they made purchases in paragraph 6 in the time frame that defendant admits the malware was collecting data. And I'd just like to say, I mean, if the district court's rule were adopted and affirmed, the requirement that plaintiffs allege with such detail, either unreimbursed charges or some kind of injury, and I don't know what it's going to take to persuade, say, the district court in this case that standing exists, it presents a very high bar to such cases and creates the perverse incentive for retailers to employ the cheapest cybersecurity rather than reasonable cybersecurity. And look, at the merit stage, if Neiman Marcus can establish that it did everything reasonably, we don't have a case on that point. We would still have a case under, say, the Customer Records Act in California. They did not provide adequate notice. And we have standing on that basis as well. Thank you. All right. Thanks very much. Thanks to both counsels. We'll take the case under advisement.